**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

LINDA WOLFE SMITH,       :
                       :
          Plaintiff,     :
                       :
       v.            :     CIVIL ACTION NO.
                       :     1:06-CV-1032-JOF
THE ATLANTA INDEPENDENT  :
SCHOOL DISTRICT,       :
                       :
         Defendant.   :

## OPINION AND ORDER

The instant matter is before the court on Defendant The Atlanta Independent School District, also known as Atlanta Public School's ("APS") Motion for Summary Judgment [93].

I.    Background

Plaintiff Lynda Wolfe Smith was a classroom teacher for APS from 1975 until February 8, 2005. Plaintiff signed a one-year contract with APS each year that she was employed. Plaintiff's final contract year began on July 1, 2004 and ended on June 30, 2005. (Contract, MSJ. at Ex 4).

A.    <u>Plaintiff Speaks as President of AAE</u>

While employed by APS Plaintiff became a member of the Atlanta Association of Educators ("AAE") and the Georgia Association of Educators ("GAE"). Plaintiff served as AAE's President from 2000 to 2005. As AAE President, Plaintiff attended and spoke at numerous Atlanta Board of Education ("the Board") meetings on issues of concern to AAE's members. Specifically, Plaintiff contends she addressed the Board on (1) the privatization of the school's nutrition program and the effect on the budget, school employees, and student health and nutrition; (2) the "fact that the moneys that had been invested in whole-school reform was also questioned regarding spending and the process by which they were rolling out these reforms and paying all of these consultants"; (3) the federal government's investigation into APS's misuse of millions of dollars in federal E-rate technology funds; (4) "exposing the State to the lack of or under-reporting of incidents with teachers getting jumped on and students getting jumped on"; (5) student discipline; (6) "the change of the charter that gave Dr. Hall the permission to hire and fire the comptroller and the chief counselor" and the balance of power in operating the Board; (7) issues raised by parents; (8) the closing of Anderson Park School; (9) the need to address middle school issues over elementary issues in the budget; (10) APS's use of funds to settle a sexual harassment lawsuit; (11) the Board's failure to disclose the $100,000,000 price on outsourcing of nutrition and janitorial services to the public; (12) the budget and general fiscal

2

mismanagement; (12) the improper treatment, targeting, and suspension of former Board member Jean Dodd; (13) the lack of available time for community input at Board meetings; and (14) personnel issues like the employee dress code, fair dismissal of employees, employee annuities, and the pay for instructional liaison specialists. (P. Aff. ¶¶ 36-53; P. Depo. 194-196; Carter Aff. ¶¶ 5-9).

Plaintiff deposed two Board members in the course of this action, Khaatim Sherrer El and 2004-2005 Board President Michael Holiman. Both Board members recall Plaintiff speaking at Board meetings on "general employee and personnel sort of concerns," "employee grievances both of her own and on behalf of her colleagues," and from time to time on "general observations about the state of the system." (El Depo. at 12-13; Holiman Depo. at 8). Neither El nor Holiman recalls any board members or APS staff ever criticizing Plaintiff for her speech. (El Depo. at 31; Holiman Depo. at 8). Neither Plaintiff's supervisor, Shirlene Carter, nor human resources employee, Thomas Adger, recalls ever witnessing Plaintiff address the Board. (Carter Depo. at 49-52; Adger Depo. at 54-55).

B.     Plaintiff Submits and Seeks to Rescind Her Notice of Retirement

On March 17, 2004, Plaintiff received a letter from the Teachers Retirement System of Georgia ("TRS") which listed her anticipated retirement date as January 1, 2005. (P. Aff. Ex 1). On October 27, 2004, Plaintiff submitted a "Separation Form" to her immediate supervisor, Dr. Shirlene Carter, indicating that she would like to begin a "Service

Retirement" on February 8, 2005. (P. Aff. Ex. 2). Plaintiff did not discuss her retirement with Dr. Carter. Dr. Carter signed the separation form and forwarded it on to Human Resources for processing.

After submitting her resignation, Plaintiff learned that TRS had incorrectly calculated her retirement date and that she would not be eligible to retire with full retirement until January 2006. Plaintiff would lose more than $20,000 in income if she retired in December 2005. On November 8 or 9, 2005, roughly twelve days after Plaintiff submitted her notice of retirement, Plaintiff submitted a Request to Rescind Separation Request to Dr. Carter, Human Resources, and her Instructional Team Leader, Ann Cantrell. (P. Aff. Ex. 3). The request did not indicate the TRS error or provide any reason for her desire to rescind. APS Personnel Director, Thomas Adger, contacted Dr. Carter to discuss Plaintiff's request and seek her recommendation with respect to it. Dr. Carter told Adger that she did not support Plaintiff's request because she had already "dissolved [Plaintiff's] classes and that [she] didn't have any place to place her." (Carter Depo. at 18). Carter contends this is the only reason she did not recommend that Plaintiff be allowed to rescind. (Carter Depo. at 19). "Dissolve" is the term Carter used for moving children to other teachers and to other classes. (Carter Depo. at 21). Carter did not physically move any children in the Fall of 2004; she moved the children "on paper" in anticipation of Plaintiff's last day in February 2005. (Carter Depo. at 21). Carter contends that there was a sense of urgency in doing the

4

rescheduling and that she contacted the counselors and registrar within two to three days of receiving Plaintiff's request to retire. (Carter Depo. at 45). Carter believed that her recommendation would be considered but might not be adopted. Adger denied Plaintiff's request; he contends he did so based on Carter's recommendation.

On November 17, 2004, Plaintiff received a letter from Adger which explained that Human Resources had received Plaintiff's November 9, 2004 request and was denying it. (P. Aff. Ex. 4). On December 1, 2004, Plaintiff received a letter from Adger which stated that Plaintiff's request for retirement had been accepted and her last day of duty would be February 8, 2005. (Resp., P. Aff. Ex. 5). This letter mentioned nothing about Plaintiff's request to rescind. On December 2, 2004, Plaintiff wrote Adger to request a reason for his denial of her request. (P. Aff. Ex. 6). In a letter dated December 10, 2004, Adger responded to Plaintiff's November 2 letter and wrote, "[s]ince APS had already accepted and processed your resignation at the time you attempted to rescind your resignation, APS denied your request. I hope this letter addresses your concerns." (P. Aff. Ex. 8).

Plaintiff contends that she did not receive this letter until after December 13, 2004. (P. Aff. ¶ 22). On December 13, 2004, Plaintiff wrote APS Superintendent Beverly Hall and Michael Holiman, as President of the Board. She detailed all of the correspondence regarding her retirement and asked the Board not to approve any personnel gains, losses, and retention report with her name on it and the Superintendent's Office to investigate

5

"allegations of discrimination base[d] on pas[t] practices where [her] case is concerned." (P. Aff. Ex. 7). Plaintiff also contends that she appeared at an ABE meeting on December 13, 2004, explained the mistake made by TRS and read her letter aloud. (P. Aff.¶¶ 19-20, Ex. 7). Plaintiff contends that she received no response from the Board so she addressed her concerns with GAE and directed TRS to speak to Adger about her retirement account. (P. Aff. ¶ 26).

On January 10, 2005, Adger wrote to GAE informing them that Human Resources had requested in January 2005 that TRS investigate Plaintiff's file. (Resp., P. Aff. Ex. 9). Plaintiff contends that she addressed the Board during a legislative meeting on January 10, 2005, and that at the time she was unaware her name was on the January 10, 2005 gains and losses report. (P. Aff. ¶ 28). The names on the gains and losses report are not available to the public. The Board approved a gains and losses report with Plaintiff's retirement on it on January 10, 2005. (Kramer Aff. Ex 3 pg. 80). On February 7, 2005, Millicent Few, APS's Chief Human Resources Officer, wrote Plaintiff and stated that APS had received Plaintiff's information from TRS and that APS had "administratively decided not to bring a recommendation for rescission of your retirement to the Board of Education." (P. Aff. Ex. 10). At this time Plaintiff learned the Board had already approved her retirement. (P. Aff. ¶ 30). Few recommended that Plaintiff resolve her problems with TRS and encouraged her

6

to apply for future positions with APS if she desired.  (P. Aff. Ex. 10).  Plaintiff worked as a substitute for APS in 2007-2008 and 2008-2009.

C.    The Role of the Board in Plaintiff's Allegations

Plaintiff maintains that the Board made the decision to not allow her to rescind her retirement when it approved the gains and losses report in January 2005 which listed her name, the code "1" for "Service Retirement" and an effective date of February 5, 2005. Plaintiff contends that they did so because of her speech and association activity as President of AAE.

Pursuant to the APS charter, the Board has the power to adopt "rules and regulations related to the manner and method of employing, disciplining, and terminating employees of the school system," "hear appeals from actions of the superintendent of schools and other personnel" and "approve the superintendent's recommendation to hire or dismiss school system staff, provided that such recommendations can be rejected by the Board only with a three-fourth's vote of the Board."  (Contract, Mot. SJ, Ex. 1-1 § 1-105(a)(3), (6), (14)). Under the Complaint and Grievance Procedure for Certified and Classified Employees, an employee may appeal to the board any complaint "relating to an alleged violation, misinterpretation, or misapplication of statutes, policies, rules, regulations or written agreements of the Board with which the Board and/or the Atlanta Public Schools is required to comply."  (MSJ Ex. 2).  Plaintiff's 2005-2006 contract states that she may not terminate

7

the contract without express written consent of the Board. (MSJ Ex. 4). The Board encourages people not to discuss personnel issues in a community forum. (MSJ. Ex. 5).

Board members El and Holiman contend that the Board delegated the day-to-day management of personnel to the superintendent and tasked the superintendent with investigating personnel issues. They explained how the superintendent brings all personnel recommendations before the Board in a block contained in a gains and losses report. The Board reviews the recommendation as a block. El testified that the Board generally accepts the recommendation as a whole except where it reviews individual cases pursuant to an employee grievance. Holiman only recalls one instance in 1999 when the Board did not approve the superintendent's recommendation on a personnel matter. El explained that once an employee files a grievance, then the superintendent makes a recommendation and provides a rationale, and the Board either votes it up or down. He maintains that sometimes the Board asks the superintendent to go back and look at a particular issue. Holiman explained that the only way a personnel issue can come before the Board is through a gain/loss recommendation from the superintendent and "through the appeals process that is available to employees to appeal adverse actions." (Holiman Depo. at 18).

Holiman and El recall very little about Plaintiff's situation. El does not specifically recall Plaintiff addressing the Board on December 13, 2004 or the Board taking any "formal action" with respect to the Plaintiff's request to rescind. (El Depo. at 24-25). El does recall

8

the Board having a conversation with the superintendent in the beginning part of an executive session shortly after Plaintiff addressed the Board relative to Plaintiff's concerns. (*Id.* at 26). El does not recall the details of this conversation and states that he does not know why Plaintiff was not allowed to rescind her resignation. (*Id.* at 25-26). El does recall that other board members were present, some board members asked background questions, and the "rationale the superintendent provided did not warrant the Board to request further review or the superintendent to come back with information." (*Id.* at 28). El, however, does not recall the particular rationale. (*Id.*). He does not recall any specific questions asked but says that the ABE "ended up with a full conversation about the situation, the impacts to the school, the class" and that this conversation "led the superintendent into a discussion about the rationale for how she and her staff decided to move forward." (*Id.* at 29). Holiman generally recalls the situation with Plaintiff. (Holiman Depo. 13-14). He contends that the Board took no action on Plaintiff's request for the ABE to help her because "[t]he Board had nothing to act on." (*Id.* at 15). Holiman does not personally recall any executive session meeting about Plaintiff. (*Id.* at 17).

Plaintiff contends that the Board approved Requests to Rescind Resignations in gains and losses reports at least twenty-six times between August 2001 and May 2005, requests for retirement mid-year more than seventy-seven times between January 2000 and November 2006, and two requests to change the effective date of retirement date in

September 2001 and May 2004. (Summary, Kramer Aff. Ex. 1). The "Summary" in the Kramer affidavit summarized more than 100 pages of documents produced by Defendant in response to an open records and discovery requests. The majority of these documents are APS Reports entitled, "Personnel Gains, Losses, Promotions, Appointments, Abolishment of Positions, Creation of Positions, and Reclassifications." Each report contained a recommendation from the superintendent "[t]hat the Atlanta Board of Education, in accordance with O.C.G.A. Section 20-2-211(1), approve the persons listed." The reports then listed employees by name, school, and position. Beside each employee's name is an effective date and a code. The codes indicated employment actions such as retirement, resignation-personal, discharged, etc. On many of these reports, the superintendent provided information below the list on employment actions that are not encompassed by the codes, such as requests for extension of approved leave, change in effective date of resignation, change in effective date of retirement, and request to rescind resignation or retirement. The reports typically listed the employment action, the employee, the effective date or the dates to be changed, and in parentheses gave a date and the word "Agenda." The date next to "Agenda" was often one month before the date of the report. The court has independently reviewed these documents and found evidence of approximately sixteen requests by teachers to rescind resignations, two requests by teachers to rescind retirements, one request by an Assistant Principal to change the effective date of his retirement, and one request by a

teacher to change the effective date of her retirement. On August 11, 2003, the Board addressed Betty Michalski's request to change the effective date of her retirement from September 30, 2003 to February 10, 2003. On September 16, 2002, the Board addressed Gary Thomas's request to change the effective date of his retirement from July 1, 2002 to August 1, 2002. On February 10, 2003, the Board addressed Gladys Southern's request to rescind retirement. All of these items were listed on gains and losses reports with agenda dates. The summary also contained a letter that Charleszetta Parland received from APS on March 13, 2006, accepting her request for retirement with a last day of May 31, 2006. The letter has a strike through it which says rescinded. The court has no information about the date this occurred. The summary also included two letters relating to Livia Simmons. Simmons wrote a letter on May 29, 2002 asking APS to rescind her letter of resignation effective January 22, 2002. She asked to be considered for a new position and stated that she was aware that her position was no longer available. On June 11, 2002, Adger wrote her a letter stating that he received her request to rescind on June 10, 2002, and "[i]nasmuch as the Atlanta Board of Education has not approved your resignation, your request for rescission is approved."

Plaintiff contends that APS did not allow her to rescind, like it had allowed so many others, because of her speech activity. Plaintiff offers her own testimony about the controversial issues on which she spoke and a meeting with El as well as an affidavit by

11

Charles Carey, the President of the Atlanta Association of Classified Employees, to support her claim. Plaintiff contends that she met with El on February 4 or 5, 2005 (after the Board had approved her retirement but before she was aware of it), on another matter, and during the meeting he looked through the binder containing documents relating to her retirement and rescission requests. (P. Aff. ¶¶ 55-56). She contends that "[a]t some point in the meeting, [she] expressed to him that [she] felt it was unfair that [she] was not given the opportunity to rescind [her] resignation" and he said, "I don't think it's fair that they are running around saying 'now we got her.'" (*Id.*). El denies that he made this statement or any like it. (El Depo. at 32-33).

El recalls having some conversation with Plaintiff either by phone, in person, or in passing, about her retirement rescission and looking at documents. (*Id.* at 23, 25). He recalls loosely that she tendered her notice of early retirement, later learned that her retirement date was miscalculated, and requested she be allowed to continue her employment with APS. (*Id.* at 23-24). El does not recall acting in any way on this conversation. Charles Carey offered his affidavit as a frequent attender at Board meetings. He testified that the Board members' demeanor toward Plaintiff at meetings was "frustration and exasperation," their "body language and lack of eye contact" indicated that they did not like or understand her," and they were "negative" towards her. (Carey Aff. ¶ 10).

D.    Plaintiff Files Suit

On May 1, 2006, Plaintiff filed an action against APS claiming that APS violated her First Amendment rights of speech and association and rights under the Equal Protection Clause of the Fourteenth Amendment by refusing to allow her to rescind her notice of retirement as prohibited by 42 U.S.C. § 1983.  Plaintiff also asserted speech and equal protection claims under Article I, § 1, ¶¶ 2 and 5 of the Georgia Constitution.  Plaintiff demanded a permanent injunction against APS prohibiting it from engaging in further actions in contravention of Plaintiff's constitutional rights, compensatory and punitive damages, and attorneys' fees and costs.  On March 14, 2007, Plaintiff moved to amend her complaint to correct a misnomer in Defendant APS's name, to add Dr. Shirlene Carter as a defendant, and to add a claim for breach of contract under O.C.G.A. §§ 20-2-940, *et seq.* Defendant did not initially respond and on April 17, 2007, filed a Motion for Leave to File an Out of Time Response.  On October 30, 2007, the parties appeared before this court.  At this hearing, the court granted Plaintiff leave to file a new Amended Complaint.  Plaintiff filed her Renewed Motion to Amend on December 19, 2007, which this court denied on June 23, 2008.  The court found that Plaintiff's claims against Dr. Carter would be futile as they would be barred by a two-year statute of limitations.  The court found that Plaintiff had presented no good cause for her delay in bringing her breach of contract claim.

AO 72A
(Rev.8/82)

Defendant filed the instant Motion for Summary Judgment on October 29, 2008. Defendant contends that (1) all Plaintiff's federal claims under 42 U.S.C. § 1983 must be dismissed because she cannot establish that her injury was caused by APS, or the Board, as opposed to Dr. Carter; (2) Plaintiff's federal and state speech and association claims should be dismissed because she did not speak on matters of "public concern" and she cannot show her speech or associational activity played a "substantial part" in the decision to deny her request to rescind; and (3) Plaintiff's federal and state equal protection claims should be dismissed because she cannot identify any similarly situated employees who were treated more favorably than she and APS had a rational basis for its decision to deny Plaintiff's request to rescind.

II.    Discussion

    A.    Defendant's Section 1983 Argument

    Defendant contends that the Board took no action on any issue specific to Plaintiff; Drs. Carter and Adger denied Plaintiff's request to rescind her retirement; and the Board cannot be held liable for Drs. Carter and Adger's action under section 1983 because they did not act pursuant to an APS policy or custom.  A plaintiff may assert a claim against a municipality for a violation of the U.S. Constitution under 42 U.S.C. § 1983 if an act of the legislative body resulted in the violation.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (discussing municipal liability based on single decision by properly constituted

14

legislative body). A plaintiff may not hold a municipality liable solely on the basis of an employer-employee relationship between it and a tortfeasor. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978) (discussing criteria for holding municipality liable based on the actions of an employee). A plaintiff may only hold a municipality liable for the action of one of its employees if the employee acted pursuant to an official municipal policy or custom. *Monell*, 436 U.S. 691-92. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (1989).

Here, the court rejects Defendant's contention that "the Board took no action on any issue specific to Plaintiff." The Board approved the January 2005 gains and losses report which included Plaintiff's retirement request. Plaintiff's retirement could not be finalized until the Board took this action. While the court takes no position on whether Plaintiff utilized the appropriate channels to bring her issue forward, the facts before the court, in the form of the El and Holiman depositions, indicate that the Board at least informally considered Plaintiff's issue, could have requested additional information, and chose not to do so. El testified that during a meeting in which numerous Board members were present, the superintendent provided a rationale for refusing to allow Plaintiff to rescind her

15

retirement, and that this rationale was sufficient enough that the Board members did not feel it necessary to request further review or have the superintendent come back with additional information. El testified that this discussion resulted in "a full conversation about the situation, the impacts to the school, the class" and how the superintendent and her staff reached their decision to move forward with Plaintiff's retirement. This testimony implies that the Board was fully informed as to Plaintiff's situation and could have prompted an additional investigation if it chose to do so. Holiman's testimony that (1) the Board sometimes asks the superintendent to go back and look at a particular issue, (2) a personnel issue can come before the Board through a gain/loss recommendation, and (3) although unusual, the Board has refused to approve the superintendent's block recommendations in the past further indicate that it is possible for the Board to single out one employee on a gains and losses report and request additional information on that situation. The Board chose not to do so here and passed the gains and losses report with Plaintiff's name in it. This was an official action by APS's properly constituted legislative body and is justiciable under section 1983. Because Plaintiff has shown that the Board acted with respect to her request, it is irrelevant whether Drs. Carter and Adger made their decisions regarding Plaintiff's situation pursuant to an official policy or custom of APS. The court declines to grant summary judgment on this ground.

AO 72A
(Rev.8/82)

B.    Plaintiff's Speech and Association Claims

Plaintiff's complaint alleges that Defendant has violated her right to freedom of speech under the First Amendment by chilling her speech "on matters of public concern regarding AAE and its public membership" and by retaliating against her "for speech on matters of public concern related to AAE's public employee membership, [to] Defendant's policies and practices, and to local school issues affecting children, parents, teachers, support personnel and taxpayers." (Cmplt. ¶ 34). A public employer may not retaliate against an employee because the employee engaged in constitutionally protected speech or associational activity; however, public employees do not have an absolute right to freedom of speech, and the state does have a legitimate interest in regulating the speech and associational activity of its employees. *See Cook v. Gwinnett County School Dist.*, 414 F.3d 1313, 1318 -21 (11th Cir. 2005) (addressing bus driver's claim she was transferred due to union speech). Courts apply a four-part test to balance the speech interests of employer and employee. *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989).

> To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech. The first two steps are questions of law; the final two

17

steps are questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech.

*Cook*, 414 F.3d at 1318 (internal citations and quotations omitted). Courts analyze free association claims in the same manner as free speech claims except they do not apply the public concern portion of the *Pickering* analysis. *Id.* at 1320. Here, Defendant contends that Plaintiff's speech and association claims should be dismissed because (1) her speech did not involve matters of public concern, and (2) her speech and associational activity did not play a substantial part in the Board's decision not to rescind her retirement request.[1]

### 1.    *Speech on Matters of Public Concern*

Speech involves a matter of public concern if the "content, form, and context" of the speech can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Cook*, 414 F.3d at 1319. *See also Anderson v. Burke County, Ga.*, 239 F.3d 1216, 1220 (11th Cir. 2001) (addressing fire fighter's union leader's distribution of a questionnaire addressing grievance procedures, vacations, promotions, and benefits to candidates for political office); *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988) (addressing public school employee claim of free speech); *Hatcher v. Board of Public Educ. and Orphanage for Bibb County*, 809 F.2d 1546, 1556 n.19 (11th Cir. 1987) (same); *Ferrara v. Mills*, 781 F.2d 1508, 1512 (11th Cir.1986) (same). The court must look at the

---

[1]The court may apply the same analysis to Plaintiff's free speech and association claims under the United States and Georgia Constitutions. *Palmer v. Stewart County School Dist.*, No. 4:04-CV-21 (CDL), 2005 WL 1676701, *12 n.11 (M.D. Ga. June 17, 2005).

AO 72A
(Rev.8/82)

record as a whole and determine whether the speaker's purpose was to raise issues of public concern, on the one hand, or to further his own private interest, on the other. *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1297 (11th Cir. 1998) (addressing housing employee's letter to supervisor about discrimination in the department). A court must evaluate each instance of alleged speech. *Connick v. Meyers*, 461 U.S. 138, 149 (1983) (evaluating each question on a questionnaire); *Anderson*, 239 F.3d at 1220 (parsing questions on questionnaire to potential elected officials); *Gonzalez*, 161 F.3d at 1297 (11th Cir. 1998) (evaluating each part of a letter and finding one part arguably a matter of public concern). A court may accept that a plaintiff's speech reflects a matter of public concern even if only portions of the speech "relate to the political, social or other interests of the community." *Anderson*, 239 F.3d at 1220 (accepting a questionnaire as reflecting a matter of public concern because it addressed three matters of public interest even though it also addressed numerous personnel issues which were not a matter of public concern). The plaintiff bears the ultimate burden of proving that the speech addresses a matter of public concern. *Maples*, 858 F.2d at 1552 n.9.

"A public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run," and courts have found numerous types of speech made by public educators to be unprotected matters of personal interest. *See Maples*, 858 F.2d at 1552-53 (collecting cases and noting

that speech concerning salary levels, course assignments, proposed course syllabus, tenure, teaching job-sharing, teaching methods and evaluation criteria were held not to be matters of public concern but speech about additional funds, admission policy, size of student body, failure to execute federally mandated programs, educational standards and accreditation were held to be matters of public concern).

While speech about union organization may be a matter of public concern, a union member's speech about wages, hours, and working conditions is not. In *Cook v. Gwinnett County School District*, a school bus driver and co-president of the United School Employees Association ("USEA"), a union-like organization affiliated with the Georgia Association of Educators, was allegedly transferred due to her speech. 414 F.3d at 1316-17. During layovers when she had no duties to complete, Cook recruited fellow employees to join the USEA and raised various safety concerns and other matters to supervisors on behalf of her fellow bus drivers. *Id.* The court addressed whether the speech was a matter of public concern. The school district argued that Cook's speech did not involve a matter of public concern because it concerned internal bus driver employment issues. *Id.* at 1319. The court rejected the district's argument and found

> As president of the USEA, Cook spoke on behalf of an organization that, *inter alia*, seeks to improve the safety of children in school and believes that well-trained and motivated employees are one of the keys to school safety. The mere fact that her speech was made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern.

*Id.* The court found that Cook's speech about the safety of children due to bus overcrowding and the lack of time allotted for pre-trip bus inspections involved a matter of public concern. *Id.* The court noted that there was "another public concern aspect of Cook's speech which provide[d] her a second layer of protection." *Id.*

> Cook recruited her fellow employees to join the USEA. She did so to improve a variety of conditions, not only for herself individually, but rather for the collective welfare of her fellow drivers. To this end, she went to the state capitol to engage in lobbying on behalf of bus drivers and took photographs with USEA members to help promote the lobbying effort. Issues regarding the operation of government, including issues of union organization, are often considered matters of public concern.

*Id.* In sum, the court found that for all these reasons Cook's speech was a matter of public concern and the district court was correct in concluding that her "speech about the competency, organization, and management of school bus drivers in the state's largest school district is certainly of public interest." *Id.*

*Cook* relied on *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940), and *Porter v. Califano*, 592 F.2d 770, 779 (5th Cir.1979), for its proposition that issues of union organization are often considered matters of public concern. *Porter* involved speech about corruption and the improper firing of a union leader for raising the issue of corruption. *Thornhill* involved speech in the form of printed signs, pamphlets and word of mouth to publicize the existence of a labor dispute. Neither case involved an employee and union member speaking to the public on hours, wages, and working conditions.

This distinction between speech about organizing a union and speech about wages, hours, and working conditions is supported by the decision in *Anderson v. Burke County*, decided after *Cook*. There, a captain with Burke County's Emergency Management Agency, who was also the President of the International Association of Fire Fighters Local 3727, prepared and distributed a questionnaire to candidates for political office in Burke County. *Anderson*, 239 F.3d at 1218-19. The court addressed whether the questionnaire could be considered speech on a matter of public concern. Some of the questions presented in the questionnaire referred to matters such as grievance procedures, vacation policies, promotion guidelines and pension benefits. The court found that these topics related to employment issues which would only concern people in their capacities as EMA employees and did not advance any interest of citizens in general. *Id.* at 1220. The court held that these issues were not transformed into matters of public concern just because they arose in a governmental office. *Id.* at 1220. Some of the questions addressed concerns about under-staffing in the 911 system, physical fitness standards for employees, and the public tax consequences of high employee turnover. *Id.* The court found that this material related to political, social, or community interest and was thus a matter of public concern. *Id.* The court made no mention of the fact that the speaker was a union president.

Here, Plaintiff testified in her deposition that she has spoken about (1) the money used for "whole-school reform," (2) the federal investigation of E-rate funds, (3) the under-

reporting of violence against teachers and students, (3) tenure, (4) the delegation of certain

hiring powers to the superintendent, and (4) the distribution of the budget between middle

schools and elementary schools. (P. Depo. at 194-96). Plaintiff submitted her own affidavit,

various documents, and the affidavit of Charles Carey indicating that she also spoke out

about (1) APS's use of funds to settle a sexual harassment lawsuit, (2) student nutrition and

APS's contract with food and janitorial provider, Sodexho, (3) general personnel issues such

as dress code, fair dismissal, pay, and benefits, and (4) the discontinuation of vocational

education. (P. Aff. ¶¶ 36-53; Carey Aff. ¶¶ 5-9). Board members El and Holiman recall

Plaintiff speaking to general employee and personnel sorts of concerns and grievances and

also upon the state of the system. El and Holiman recall no particular speech by Plaintiff

and do not offer any testimony that would call into question Plaintiff's assertions about her

speech.

　　　While it is clear that Plaintiff's discussion of personnel issues, such as the employee

dress code, fall within the type of speech rejected in *Maples* and *Anderson*,[2] it is likewise

clear that Plaintiff's speech on childhood nutrition, the E-rate scandal and investigation,

student safety, and the use of school system funds to settle lawsuits can "be fairly considered

as relating to any matter of political, social, or other concern to the community." Under the

_____

[2]Plaintiff is not entitled to the "second layer of protection" referenced in *Cook*. Plaintiff was speaking before the Board in her capacity as union president on wages, hours, and working conditions. Plaintiff was not speaking about union organization or the ability to organize a union.

Eleventh Circuit's holding in *Anderson*, this court may accept Plaintiff's speech as addressing a matter of public concern even though portions of Plaintiff's speech clearly addressed personnel issues of interest only to APS employees.

Defendant offers no persuasive argument to the contrary. In arguing that Plaintiff has not met her burden on the public concern prong, Defendant ignores many of the topics Plaintiff referenced in her deposition, incorrectly argues that Plaintiff's affidavit should be stricken, questions the authenticity of Plaintiff's supporting documents, and contends that Plaintiff has not shown that the Board members were aware of her speech, if it occurred, on matters of public concern. Defendant's argument about Plaintiff's documentation is misplaced. Nothing in the documents submitted by Plaintiff indicates that Plaintiff did not speak on the matters of public concern that she asserts in her deposition and affidavit, and Plaintiff's unrebutted testimony alone sufficiently meets her burden on summary judgment. Defendant's argument about whether the Board was actually aware of Plaintiff's speech is also misplaced at this stage of inquiry. Whether the Board was aware of Plaintiff's speech goes to whether Plaintiff's speech had a substantial impact on the Board's action in approving her retirement and not to whether Plaintiff can show she spoke on issues of public concern. The court finds that Plaintiff has sufficiently shown that she spoke on issues of public concern and will not grant summary judgment on this basis.

> 2.      *Substantial Impact of Speech and Association Activity*

A plaintiff's burden in showing that her protected conduct was a substantial factor in the adverse employment action against her is "not a heavy one." *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 (11th Cir. 2000) (addressing police officer who was terminated in part for exercise of speech rights). Because "it is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was 'substantial' or 'motivating factor' behind a government employment decision," courts must "examine the record as a whole to ascertain whether [the plaintiff] presented sufficient evidence for a reasonable jury to conclude that [the plaintiff's] speech was a 'substantial' motivating factor" in the Defendant's decision. *Id.* Several factors are relevant to this inquiry, including (1) whether the employment action closely followed the protected activity, (2) whether the Defendant's asserted reasons are pretextual, (3) whether the Defendant's asserted reason for its action has varied, and (4) circumstantial evidence of causation such as who initiated the employment action, evidence of management hostility to the speech, or an employer motive to retaliate. *Id.* No one factor is outcome determinative. *Id. See also Addison v. Gwinnett County*, 917 F. Supp. 802, 810 (N.D. Ga. 1995) (Evans, J.) (addressing speech retaliation claim and finding that "[a] plaintiff cannot show that her exercise of protected activity was a substantial or motivating

factor in her termination where she has no evidence that her employer was actually aware of her activity.").[3]

In *Stanley* a lieutenant in the narcotics unit testified to the Georgia Bureau of Investigation that he suspected another officer, the deputy chief in charge of the evidence room, of theft of money from the evidence room. 219 F.3d at 1282. The deputy chief ultimately learned of Stanley's comments. *Id.* at 1283. The deputy chief ultimately became chief; as chief he took numerous employment actions against Stanley that Stanley did not like including a transfer, administrative leave, an investigation, and a charge of unprofessional conduct. *Id.* at 1283-84. The chief ultimately terminated Stanley for these incidents. *Id.* at 1285. The Eleventh Circuit found that although it was a close call, Stanley had presented sufficient evidence to create a jury question on the issue of causation, despite a four-year gap between the protected speech and the termination, because Stanley's evidence showed that the chief (1) confronted Stanley about his statements and challenged the basis for Stanley's suspicions; (2) transferred Stanley without asking his preference of assignments as he did others; (3) failed to follow departmental policy in advertising an available promotion and promoted another employee even though Stanley was eligible for

---

[3]The court in *Addison* also examined the time gap between Plaintiff's speech and the employment action, the other legitimate reasons for Plaintiff's dismissal including evidence of her incompetence, and the employer's lack of motive, including the lack of evidence that her speech negatively reflected upon or would embarrass her employer. 917 F. Supp. at 810-11.

consideration for the promotion; (4) ordered an investigation of an incident and reprimanded Stanley even after he passed a polygraph test; (5) asked Stanley after one incident how it felt "to be put under the microscope of suspicion"; and (6) reprimanded only Stanley and not another officer when an internal investigation faulted both of them. *Id.* at 1292.

Here, Plaintiff presented the following as evidence of "substantial impact": (a) her testimony that El told her "they are running around saying, 'now we got her,'" (b) the Board's pattern of approving other requests to rescind, mid-year retirements, and requests to change the effective date of retirement, and (c) Carter's refusal to reverse the process of reassigning Plaintiff's classes even though she submitted her request to rescind twelve days after her retirement request and no children had physically been moved. Defendant contends that this evidence is insufficient because (a) Plaintiff's interpretation of El's comment is speculative and the statement itself is inadmissible hearsay, and (b) the other individuals whose requests to rescind were approved are not valid comparators.

The court agrees with Defendant that El's alleged statement, which El himself has denied, is of little or no value to Plaintiff. Putting the issue of hearsay aside, Plaintiff has offered absolutely no evidence that "they" was a majority of the Board members, *see Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006) (Forrester, J.) (finding that plaintiff cannot prove a final decision making body had an improper motive by showing that

one or a minority of members had improper motive),[4] or that "they" were out to get Plaintiff because of her protected speech on matters of public concern. Plaintiff was a labor representative who frequently spoke at Board meetings and frequently demanded concessions for APS employees including additional pay and benefits. It would not be out of the realm of the probable to assume that some of the Board members did not like Plaintiff or that some of the Board members would not mind seeing Plaintiff retire. This fact alone, however, says nothing about the Board members' feelings toward Plaintiff's speech regarding issues of public concern rather than personnel issues or whether the Board was motivated to act in Plaintiff's case by her speech on matters of public concern.

The court is more persuaded by the Board's repeated approval of other requests to rescind, requests to retire mid-year, and requests to change the effective date of retirement. Defendant argues that none of the twenty-six employees who also rescinded that Plaintiff identified is a valid comparator. Defendant insists that twenty-five of the twenty-six comparators did not request to rescind mid-year resignations or retirements. Defendant

---

[4]In *Rainbow City*, the plaintiff produced evidence from which a reasonable jury could have found that the mayor of Rainbow City sought to punish the plaintiff in retaliation for protected speech by denying him a permit. 434 F.3d at 1313. The court found that in order to find Rainbow City liable for the alleged retaliation, it must find that the Planning Commission, or the final policy maker, of which the mayor was a part, acted with an improper motive, and an improper motive by one member of the nine-member Commission could not be imputed to the rest of the Commission. *Id.* In order to impute the mayor's motive to the Commission, the plaintiff would have had to show that the Commission ratified the mayor's decision and his unconstitutional motive. *Id.*

28

maintains that a mid-year resignation or retirement is a breach of contract, and it is immaterial whether APS chose to waive that breach in certain situations. Defendant contends that the one comparator, Gladys Southern, who did request to rescind a mid-year retirement is not a valid comparator because she was not under Dr. Carter's supervision; there is no evidence that Dr. Adger approved her request; and there is no evidence that she spoke out on matters of public concern or engaged in protected activity. Defendant's arguments fail. First, several of the individuals on Plaintiff's list of comparators have requests to rescind dates in September and October. The court is prepared to judicially notice that APS's regular school calendar starts in August and has done so for all the years relevant to this action. Thus, a request to retire or resign in September or October, one or two months into the fall semester, would be no less "mid-year" or require any less shuffling of students than a retirement request for February, one month into the spring semester. Second, Defendant completely ignores the case of Zena Ford who requested to change the effective date of her retirement from July 31, 2004 to March 29, 2004. A retirement date of March 29 would create the same difficulties for students, if any, that a February retirement date would cause. Third, the issue of whether the comparators are managed by Dr. Carter is irrelevant. The relevant action before the court is the Board's passage of the gains and losses report after hearing the superintendent's explanation of Plaintiff's request. Last, Plaintiff need not show that her comparators spoke on matters of public concern, and

indeed it is just the opposite. Plaintiff is trying to show that the Board allowed other individuals to rescind their retirements who were like her in all respects *but* their speech, and thus it was her speech and no other factor which caused the Board to deny her request.

Under the standard in *Stanley*, Plaintiff's burden is "not a heavy one." This court finds that Plaintiff has presented sufficient evidence to create a jury question on the issue of causation. Under the *Stanley* factors, Plaintiff has shown that (1) the Board's action closely followed the protected activity, *i.e.*, Plaintiff was still acting President of AAE at the time the Board approved her retirement after hearing the superintendent's explanation of her request to rescind; (2) Defendant's asserted reasons could be pretextual, *i.e.*, Dr. Carter had not actually physically moved any students around and Plaintiff's request to rescind came only a few days after her original request to retire; and (3) circumstantial evidence of causation including evidence of management hostility to the speech in the form of the Carey affidavit and a motive to retaliate in terms of all the negative comments Plaintiff made about the performance of elected board members. Plaintiff's comments questioned the Board members' competence and integrity and could have caused others in the community to do so. Board members had an incentive to make sure she was no longer associated with the school system. The court will not grant summary judgment on this ground.

AO 72A
(Rev.8/82)

C.    <u>Plaintiff's Equal Protection Claims</u>

In her complaint Plaintiff contends that Defendant violated her right to equal protection under the laws by treating her differently "than her similarly situated co-workers with different personal and professional affiliations" or by treating her differently "because of her affiliation with AAE." (Cmpl. ¶¶ 41-42). Plaintiff's complaint lists twelve APS employees who were allowed to rescind resignations or change their retirement date. The Equal Protection Clause directs states to treat all persons similarly situated alike. *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "The scope of the Equal Protection Clause of the Georgia constitution is . . . coextensive with the scope of the Equal Protection Clause of the federal constitution," and this court applies the same analysis to Plaintiff's claims under each. *See Nodvin v. State Bar of Ga.*, 544 S.E.2d 142, 145 (Ga.2001) ("Because the protection provided in the Equal Protection Clause of the United States Constitution is coextensive with that provided in Art. I, Sec. I, Par. II, of the Georgia Constitution of 1983, we apply them as one.").

Plaintiff's equal protection claim may be construed one of two ways – either Plaintiff is alleging that she is a "class of one" and she is being treated differently from others similarly situated without any rational basis, *see Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007) (discussing class of one claims), or Plaintiff is alleging that the Board has discriminated against her because of her union membership and her speech at

31

Board meetings, *see E & T Realty v. Strickland*, 830 F.2d 1107, 1112-14 (11th Cir. 1987) (explaining types of equal protection claims). The court finds that Plaintiff's claim fails under either theory.

To prove a "class of one" claim, a plaintiff must generally show that he was treated differently from other similarly situated individuals, and (2) that the defendant unequally applied a facially neutral policy for the purpose of discriminating against him. *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1045 (11th Cir. 2008). The Supreme Court recently narrowed such "class of one" suits in the context of public employees. In *Engquist v. Oregon Dept. of Agr.*, 128 S. Ct. 2146, 2156 (2008), the Court addressed whether a public employee could state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on the employee's membership in any particular class and found that there was no place for a "class of one" theory in the public employment context. *Id.* at 2148-49. Therefore, Plaintiff cannot argue that she was not allowed to rescind her retirement because the Board disliked her personally or disliked her because she was the President of the Union. To successfully plead equal protection, Plaintiff must contend that the Board refused to allow her to rescind because of her classification as a member of the AAE.[5]

---

[5]Union membership is not a suspect classification entitled to heightened scrutiny under the Equal Protection Clause, and as such this court must apply a rational basis analysis

AO 72A
(Rev.8/82)

To establish her claim, Plaintiff must show that (1) APS treated her differently from others who were similarly situated on the basis of her union activities, and (2) APS had no rational basis for the alleged dissimilar treatment. *Cleburne*, 473 U.S. at 439-42. "Different treatment of dissimilarly situated persons does not violate the equal protection clause," and courts are obliged to apply the "similarly situated" requirement with rigor. *See Griffin Industries, Inc. v. Irwin*, 496 F.3d 1189, 1207 (11th Cir. 2007) (finding two plants not similarly situated and dismissing plaintiff's claim it was subject to stricter environmental regulation); *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367-68 (11th Cir. 1998) (denying landowner's claim that he was treated differently than others applying for permit). A legislative body has a rational basis for its action "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" and legislative policies are accorded a strong presumption of validity. *Houston v. Williams*, 547 F.3d 1357, 1363 (11th Cir. 2008).

Here, Plaintiff's complaint identified twelve individuals employed by Defendant whom Defendant allowed to rescind an employment action. Defendant contends on summary judgment that these individuals are not similarly situated to Plaintiff because four were not teachers with annual contracts and Plaintiff has not established that any were non-

---

to Defendant's action. *See Lyng v. Int'l Union*, 485 U.S. 360, 370 n.8 (1998) (union strikers not entitled to special treatment under Equal Protection clause); *City of Charlotte v. Local 660, Intern. Ass'n of Firefighters*, 426 U.S. 283 (1976) (applying reasonable basis to union claim that they were not allowed to have dues subtracted from paycheck).

AO 72A
(Rev.8/82)

union employees supervised by Dr. Carter. Plaintiff offers no response to Defendant's argument; Plaintiff merely drops a footnote directing the court to her response to Defendant's Statement of Undisputed Material Facts and her Statement of Additional Disputed Material Facts. These documents do not directly discuss the characteristics of Plaintiff's comparators. Plaintiff did submit numerous documents in conjunction with her response which do address her comparators, including (1) a list of twenty-six individuals who were allowed to rescind their resignations between August 2001 and May 2005, (2) a list of two individuals who were allowed to change the effective date of their retirement in September 2002 and May 2004, (3) a list of seventy-seven individuals who were allowed to retire mid-year between January 2000 and November 2006, and (4) letters and/or gains and losses reports addressing each of the resignations and retirements listed.

Even viewing this evidence in the light most favorable to Plaintiff, the court cannot find that Plaintiff has presented evidence of "similarly situated" individuals being treated differently. None of Plaintiff's documentation indicates whether the individuals she addresses are members or officers in the AAE or whether these individuals have ever spoken at Board meetings. Plaintiff needs to provide the court with such information for the court to determine whether Defendant treated Plaintiff differently because of her union membership and activity.

34

Determining whether individuals are similarly situated is generally a question of fact for the jury; however, where there is no genuine issue of material fact that such a comparator exists, the court may decide this matter on summary judgment. *Eggleston v. Bieluch*, 203 Fed. Appx. 257, 264 (11th Cir. 2006); *Douglas Asphalt Co. v. Qore, Inc.*, No. 07-14849, 2008 U.S. App. LEXIS, at *12-13 (11th Cir. Sept. 2, 2008). The court finds that Plaintiff has presented no genuine issue of material fact as to whether a comparator exists, *i.e.*, a teacher who requested to rescind her retirement mid-year and was not in the union and did not engage in union speech. The court notes that the legal analysis necessary for the Plaintiff's equal protection claim is different than the legal analysis necessary to assess "substantial impact" in the context of Plaintiff's First Amendment claim, and it is therefore not inconsistent to find Plaintiff's comparator evidence to be deficient in the first analysis and sufficient in the latter.

III.    Conclusion

For the reasons articulated above, the court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment [93]. Plaintiff's equal protection claim should be dismissed. Plaintiff may proceed with her First Amendment claim.


**IT IS SO ORDERED** this 4th day of May 2009.


35

AO 72A
(Rev.8/82)

_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)